**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BUDICAK, INC., on behalf of itself and all others similarly situated,<br><br>                              Plaintiff,<br><br>                - against -<br><br><br>LANSING TRADE GROUP, LLC, and JOHN DOES NOS. 1-6<br><br><br>                              Defendants. | Civil Action No. _____<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Budicak, Inc., ("Plaintiff") complains upon information[1] and belief as to all matters against Defendants Lansing Trade Group, LLC (hereinafter "Lansing") and John Does Nos. 1-6 as follows:

**NATURE OF THE ACTION**

1.     This action arises from Defendants' unlawful and intentional manipulation of wheat futures and options contracts traded on the Chicago Board of Trade ("CBOT") from at least February 1, 2015 through March 31, 2015 (the "Class Period"), in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* (the "CEA"), the Sherman Antitrust Act, 15 U.S.C. § 1, and the common law.

---

[1] Plaintiff's information includes counsel's investigation, publicly available data from the *Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, In the Matter of: Lansing Trade Group, LLC,* CFTC No. 18-16 (Jul. 12, 2018) ("CFTC Order"); the *CME Group Inc. Notice of Disciplinary Action,* CBOT-15-0160-BC (Jul. 12, 2018) ("CME NDA"); news articles; and other information.

2.      Lansing is a commodity merchandising company largely focused on the purchase, handling, storage, and sale of physical commodities including grains like wheat, feed ingredients, and energy products within North America and internationally.

3.      Lansing transacts in the "cash" wheat market—the direct purchase or sale of physical wheat. It also employs traders who buy and sell related commodity futures, including CBOT wheat futures and options contracts.

4.      Leading up to March 2015, Lansing held 134 Soft Red Winter Wheat ("SRW") shipping certificates ("shipping certificates" or "Wheat Certificates"). After the close of trading on March 3, 2015, Lansing traders got advance word that another market participant was planning to register and tender for delivery a large number of Wheat Certificates with 3 ppm Vomitoxin wheat (wheat with 3 parts per million deoxynivalenol, also known as Vomitoxin).[2]

5.      Upon learning this inside information, Lansing traders executed a manipulative strategy to use the cash wheat market to manipulate the prices of wheat futures and contracts.

6.      Later that day on March 3, 2015, Lansing's insider tip proved true, and a market participant registered and tendered 250 SRW shipping certificates (1.25 million bushels of wheat) with 3 ppm vomitoxin wheat. This 3 ppm vomitoxin wheat was below milling-grade and the market perceived a lack of demand for this type of wheat as a result.

7.      With the price of the May 2015 wheat contract and associated spreads decreasing (due to the market's perceived lack of demand for this wheat), between March 3 and March 11, 2015, Lansing traders began increasing their long May 2015/July 2015; July 2015/September 2015; and

---

[2] Vomitoxin is a mycotoxin that may be produced in wheat infected by Fusarium head blight or scab. According to the U.S. Food and Drug Administration, finished baked goods must have a vomitoxin level below one part per million.

September 2015/December 2015 wheat spread positions ("Long Wheat Spread Positions") and increasing their May 2015 and July 2015 wheat call option positions ("Wheat Call Option Positions").

8.      Meanwhile, from March 5 and March 10, 2015, Lansing's traders purchased all remaining 250 SRW Wheat Certificates, bringing the total amount of registered certificates it owned to 384, signaling to the market that it would eventually cancel them for load-out. Lansing did this for no reason other than to manipulate the price of CBOT wheat futures and options contracts.

9.      To be sure the market would react to Lansing's false signal, on March 6, 2015 a Lansing trader communicated and conspired with the writer of a daily cash wheat newsletter, who agreed to disseminate information about Lansing's "intent" to cancel and load-out the Wheat Certificates to the market. By making sure this information disseminated and affected prices, Lansing falsely signaled demand in the market for 3 ppm vomitoxin wheat, thus manipulating the prices of CBOT wheat futures and options contracts.

10.      By eventually canceling all 384 SRW Wheat Certificates for load-out by March 10, 2015, and taking steps to ensure news of its cancellation spread across the market, Lansing sent false and misleading signals into the market of a demand for 3 ppm Vomitoxin wheat to increase the value of its own Long Wheat Spread and Wheat Call Option Positions that it had been gradually accumulating over the course of a week.

11.      Lansing traders communicated internally among themselves and externally with John Doe Defendants, who acted as market participant co-conspirators, to effectuate their illegal and manipulative scheme.

12.      By March 10, 2015, Lansing had canceled for loadout all 384 SRW Wheat Certificates and sent false and misleading signals into the marketplace that there was demand (though it was artificial), for Wheat Certificates of 3 ppm Vomitoxin wheat.

13.    Lansing's false and artificial signal of demand for Wheat Certificates of 3 ppm Vomitoxin wheat increased the value of its own Long Wheat Spread and Wheat Call Option Positions. Lansing's manipulation caused prices of CBOT wheat futures and options contracts to be artificial throughout the Class Period.

14.    These illicit profits benefited Lansing's futures and options position and caused harm to Plaintiff and Class members who in good faith transacted in CBOT wheat futures and options contracts at artificial prices proximately caused by Defendants' manipulative conduct.

15.    On July 12, 2018, the U.S. Commodity Futures Trading Commission ("CFTC") entered an Order related to these allegations. The CFTC filed and settled charges against Lansing for multiple violations of law related to the manipulation of the price of wheat futures and options contracts that were traded on the CBOT. The CFTC Order required Lansing to pay a $3.4 million civil monetary penalty, to undertake remedial measures to strengthen its internal controls relating to compliance concerning the anti-manipulation provisions of the CEA and CFTC Regulations, and to cease and desist from further violations of the CEA and CFTC Regulations.  In imposing its civil monetary penalty, the CFTC Press Release stated the Commission "took into account the [$3.15 million] fine imposed by the CME in its related action," and yet still fined Lansing an additional $3.4 million, bringing the total monetary fine against Lansing up to $6.55 million.[3]

16.    Also on July 12, 2018, the CME Group Inc. which owns and operates the CBOT, issued a Notice of Disciplinary Action ("NDA") against Lansing, whereby Lansing agreed to pay a fine of $3.15 million arising out of the manipulation of the same wheat futures contracts that are the subject of the CFTC's Order.[4] Pursuant to an offer of settlement, on May 23, 2018, a Panel of the

---

[3] Press Release, CFTC, CFTC Orders Commodity Trading Firm to Pay $3.4 Million Penalty for Attempted Manipulation of Agricultural Markets (Jul. 12, 2018), *available at* https://www.cftc.gov/PressRoom/PressReleases/7754-18.

[4] CME NDA.

CBOT Business Conduct Committee found that in March 2015, employees of Lansing engaged in a strategy in which it acquired and loaded out wheat for delivery to send false or misleading signals to the market of demand—to manipulate the price of wheat futures contracts and benefit Lansing's futures and options positions at the CBOT.

17.     Given the concealed and secretive nature of Defendants' manipulation, more evidence supporting the allegations in this Complaint, including the identities of John Doe Defendant co-conspirators, will be uncovered after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

18.     This action arises under Section 22 of the CEA, 7 U.S.C. § 25.

19.     Wheat is a "commodity" in interstate commerce and is the "commodity underlying" CBOT wheat futures and options contracts, as those terms are defined and used in Section 1a(9) and 22 of the CEA, 7 U.S.C. §§ 1a(9) and 25(a)(1)(D), respectively.

20.     This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, 28 U.S.C. §§ 1331 and 1337.

21.     Venue is proper in the Northern District of Illinois pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c), 28 U.S.C. § 1391(b) through (d).

22.     The CBOT wheat futures trading was conducted, and Defendants otherwise transacted business, in the Northern District of Illinois. The claims arose in this District. The Plaintiff is headquartered in this District. Other substantial parts of the events giving rise to the claims asserted herein occurred in this District.

23.     The CBOT is located in this District at 141 West Jackson Boulevard, Chicago, Illinois, 60604. Defendants' unlawful acts manipulated the prices of CBOT wheat futures and options contracts which are traded in this District on the CBOT. The CBOT became a wholly-owned subsidiary of the CME Group Inc. ("CME") in or around July 2007. In July 2018 the CME issued a

Notice of Disciplinary Action against Lansing, fining them $3.15 million dollars for the manipulation that is the subject of the CFTC's Order.

24. The CBOT is designated by the CFTC as a board of trade. The CBOT applies to the CFTC for permission to trade each commodity in which the CBOT offers a contract. The CBOT must establish, among other things, that the proposed contract is not prone to price manipulation to win approval to trade such contract. CBOT members and clearing members have to follow the rules of the CBOT and CME, including the rules prohibiting manipulation.

25. Defendants, directly and indirectly, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and course of business alleged herein.

## PARTIES

26. Plaintiff Budicak, Inc. is an Illinois corporation with its principal place of business in Oak Brook, Illinois. Plaintiff traded CBOT wheat futures contracts during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation as alleged herein. Plaintiff was deprived of transacting in a lawful, un-manipulated market in CBOT wheat futures contracts, and otherwise suffered legal injury as a direct and proximate result of Defendants' manipulative conduct.

27. Defendant Lansing Trade Group, LLC is a Delaware limited liability company, with principal place of business in Overland Park, Kansas and offices and facilities all over the United States, that acts as a commodity merchandising firm, largely focused on buying, handling, storing, and selling physical grain, including wheat.

28. John Doe Defendants 1-6 are other entities or persons, including market participant co-conspirators and/or a newsletter/writer referenced in the CFTC Order and CME Notice of Disciplinary Action, whose identities are currently unknown to Plaintiff. John Doe Defendants 1-6, participated in, furthered, and/or combined, conspired, or agreed with Lansing and others to perform

6

the unlawful acts alleged herein, including manipulation of wheat futures and options contracts that were traded on the CBOT.

29.    On one occasion, a John Doe Defendant co-conspirator communicated with a Lansing trader to discuss the market perception of Lansing's cancelling and loading-out 384 SRW Wheat Certificates and the effect it would have on the price curve of Lansing's Long Wheat Spread and Wheat Call Option Positions. On another occasion, a John Doe Defendant acted as a co-conspirator whose aim it was to amplify the effects of Lansing's manipulative scheme to cancel for load-out the Wheat Certificates by disseminating that information into the marketplace to have a more potent impact on the price.

30.    Defendants are responsible for, and acted for one another with respect to the trading and manipulation at issue. Each was an agent and/or person acting on behalf of the other Defendant.

## UNDERLYING ALLEGATIONS

### I.    Background

31.    **Commodity Futures Contract.** A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity, like wheat, at a specified time. In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based.

32.    **Options Contract**. An options contract is an agreement that gives the buyer, or "option holder," the right, but not the obligation, to either buy or sell something at a specified price during a specified time period. "Call" options confer upon the buyer the right, but not the obligation, to buy the asset at the specified price (the "strike" price). Call options confer upon the seller, or "option writer" the obligation to sell the asset at the strike price.  "Put" options confer upon the buyer the right, but not the obligation, to sell the asset at the strike price, and they confer upon the seller the obligation to buy the asset at the strike price.

33. **"Long" and "Short."** CBOT wheat futures contracts represent a commitment to make (in the case of a short contract) or take (long contracts) delivery of wheat at a defined point in the future. Wheat futures contracts may be settled by delivery of the actual commodity at the conclusion of the contract. But these deliveries don't often happen. To avoid delivery, the wheat futures contract can be offset or "rolled" forward before the contract goes into its delivery cycle. These delivery cycles occur during five different contract months each calendar year: March, May, July, September, and December. For options on wheat futures, trading may be conducted in the nearby wheat futures options contract month and any succeeding months. The bilateral aspect of the futures contract is that there is a seller and a buyer—two sides, a long and a short. The "long" side is the buyer of the contract. In the rare event that the long does not offset or liquidate, the long is obligated to take delivery and pay for the commodity. The "short" side is the seller of the contract. In the rare event that the short does not enter an offsetting trade, the short is obligated to make delivery of the commodity during the delivery dates.

34. **Offset by Trading.** Futures market participants almost always "offset" their futures contracts before the expiration month when deliveries occur. For example, a purchaser of one wheat futures contract may liquidate or cancel or offset a future obligation to take delivery of wheat by selling one wheat futures contract. This sale of one contract offsets or liquidates the earlier purchase of one contract. The difference between the initial purchase price and the sale price represents the realized profit or loss for the trader.

35. **Open Interest.** Open interest is the total number of futures contracts in a delivery month that have been entered into and not yet liquidated by an offsetting transaction or fulfilled by delivery.

36. **Volume.** Volume is the number of contracts traded during a specific period of time.

37.     Futures markets are carefully designed to facilitate ease of trading into and out of futures contract positions without deliveries. As a result, deliveries are rare. A very small percentage of all futures contracts traded each year are satisfied by delivery of the underlying commodities.

38.     Trading in CBOT wheat futures and options contracts is subject to the rules and regulations of the CBOT, including Chapter 14 (Wheat Futures) of the CBOT Rulebook.[5] Chapter 14 of the CBOT Rulebook sets forth the details for deliveries on CBOT wheat futures contracts, including, for example, wheat grade differentials, location differentials, and delivery points.

39.     CBOT wheat futures and options contracts are transacted electronically on the CME's Globex electronic trading platform and, in the case of options, also through "open outcry" on the trading floor of the CBOT. Open outcry is a method of public auction for making bids and offers in the trading pits of futures exchanges.

40.     Prices of CBOT wheat futures contracts are quoted in cents per bushel. The contract size for a CBOT wheat futures contract is 5,000 bushels, or about 136 metric tons.

41.     CBOT wheat options contracts are the same size as one CBOT wheat futures contract.

42.     The "tick size" or minimum price fluctuation for trading wheat futures is ¼ cent per bushel, which is equivalent to $12.50 per futures contract, including spreads.

43.     CBOT wheat futures contracts are traded for delivery during five different contract months each calendar year: March (H), May (K), July (N), September (U), and December (Z). The last trade date for a particular CBOT wheat futures contract is the business day before the 15th calendar day of the contract month.

44.     CBOT wheat futures contracts are settled by physical delivery. The last delivery date is the second business day after the last trading day of the delivery month.

---

[5] *Available at* http://www.cmegroup.com/rulebook/CBOT/II/14/14.pdf.

45.    The CBOT issues a daily report showing the total number of shipping certificates registered as of 4:00 p.m. on each trading day of the week. The daily report information is posted on the CBOT Exchange Web site. The daily report shows the names and locations of facilities whose shipping certificates are registered. All wheat shipping certificates are required by CBOT Rules to be marked as either 2 ppm vomitoxin, or 3 ppm vomitoxin. Shipping certificates marked as 2 ppm are to be delivered at contract price, while shipping certificates marked as 3 ppm are to be delivered at a 20-cent-per-bushel discount.

46.    Every aspect of a futures contract traded on the CBOT, like the grade and amount of wheat, is standardized—except the price and delivery month. This standardization of futures contracts is specifically designed to facilitate the ease of trading of fungible contracts in one central market place. Furthermore, the delivery date is standardized within a particular contract month. For example, all March wheat futures contracts require delivery at the beginning of April.

47.    **Spreads.** A spread refers to the price differential between any two items. For example, "spreads" often refer to price differences between futures contracts on the same commodity but with different expirations. For example, a spread could consist of the simultaneous purchase of a May wheat futures contract and the sale of a September wheat futures contract, in which the term "spread" would describe the difference between the purchase price and the sale price of the two contract month components "Spreads" can also refer to the difference between the physical or "cash" commodity market price and the futures market price.

48.    Usually in a "spread position," the trader is long or short a futures contract for one delivery month and the opposite for another delivery month. For example, a person could be short the May 2015 wheat futures contract and long the July 2015 wheat futures contract, which would be called a spread position or a "calendar spread" position.

49.    **"Canceling for Load Out."** CBOT wheat futures contracts are physically delivered upon expiration. The delivery instrument on the wheat futures contract is a called a shipping certificate ("Wheat Certificate" in the context of this Complaint) and only warehouses approved by the exchange can register and deliver these certificates. The owner of a shipping certificate has several options: Shipping certificates can be bought and sold between traders or exchanged for futures positions, so the owner can transfer and sell the certificate to another market participant. The owner could also hold the certificate and pay storage fees. Or the owner could "cancel" the shipping certificate and order that the physical grain be "loaded-out" for transport. This is known as "cancelling for load-out," and it is the mechanism Lansing used to manipulate the market after purchasing the SRW Wheat Certificates at issue in this case. Cancelling a Wheat Certificate for load-out signals to other market participants that there is immediate demand for the wheat—read: somebody wanted the wheat taken out of storage. Demand for wheat drives up prices, including the value of CBOT wheat futures and options contracts.

II.    **Substantive Allegations**

A. **Lansing's Manipulative Scheme**

50.    Lansing is a commodity merchandising company that purchases, sells, handles, and stores physical commodities such as wheat in the cash market.

51.    During the Class Period, Lansing utilized the cash wheat market to illegally make profits and benefit its own trading positions from trading CBOT wheat futures contracts and options in a manipulative scheme.

52.    Leading up to March 2015, Lansing held 134 SRW Wheat Certificates.

53.    On a February 3, 2015 telephone call, unidentified Lansing Trader 1 agreed with a market newsletter writer's statement showcasing the importance that the physical or "cash" wheat market plays in being able to manipulate the spreads on wheat futures and options contracts:

"[M]aking money on the cash is immaterial. You make the money on the spread . . . Cash is just, you know, the cash is the tool, the risk of the tool you had to use to make the play on the spread."[6]

54.    Beginning on or before February 3, 2015, Lansing traders exhibited an understanding that given Lansing's prowess as a dominant market participant in the cash wheat market, it could simultaneously use its experience there to use "cash [as] the tool"[7] to benefit its trading positions in wheat futures and options contracts.

55.    After the close of trading[8] on March 3, 2015, Lansing traders received advance information that another market participant was planning to register and tender for delivery a "large number" of shipping certificates with 3 ppm vomitoxin wheat. This registration would signal to the market that there was a lack of demand for the wheat, and the price of the futures contracts would drop.

56.    Over the next few days, armed with this information, Lansing embarked on a pre-meditated (as evidenced by the February 3, 2015 telephone conversation), manipulative strategy whereby they would, take advantage of the depressed prices on the futures market resulting from the other market participant's tendering of the shipping certificates and:

      i.    Increase their long May 2015/July 2015; July 2015/September 2015; and September 2015/December 2015 wheat spread positions ("Long Wheat Spread Positions") on the cheap; and

      ii.    Increase their May 2015 and July 2015 wheat call option positions ("Wheat Call Option Positions"), also on the cheap.

---

[6] CFTC Order at 4.

[7] CFTC Order at 4.

[8] According to the CME's Web site, trading hours for wheat futures contracts on the CME Globex Exchange are between 19:00-7:45 and 08:30-13:20 (Central Time). Trading hours for wheat options contracts on the CME Globex Exchange are between 19:00-7:45 and 08:30-13:20 (Central Time) and between 08:30-13:15 (Central Time) in the Open Outcry pit, *available at* https://www.cmegroup.com/trading-hours.html.

57.     Then, Lansing would go on to:

    i.    Purchase the 250 SRW Wheat Certificates with the 3 ppm Vomitoxin wheat at a 20-cent-per-bushel discount pursuant to CBOT Rule 14104;

    ii.    Cancel the 384 SRW Wheat Certificates for load-out and delivery in order to send false and misleading signals into the market that there was demand of the 3 ppm Vomitoxin. By doing this, and making sure the market was aware of it, they would artificially signal to the market that somebody wanted this wheat immediately, which would manipulate upwards the price of the wheat futures and options contracts it just bought; and

    iii.    Increase the value of, and reap artificially high profits on, Lansing's Long Wheat Spread and Wheat Call Option Positions.

**B. Lansing Executes the Strategy**

58.     Just as Lansing expected, late in the day on March 3, 2015, a market participant registered and tendered 250 SRW shipping certificates (1.25 million bushels of wheat) with 3 ppm vomitoxin wheat, which was reflected on the CME shipping receipt report issued after 4:00 p.m. This 3 ppm vomitoxin wheat was below milling grade and the market perceived a lack of demand for this wheat as a result.

59.     Given the market's perception of a lack of demand for 3 ppm vomitoxin wheat, based on the 250 SRW shipping certificates that had been registered and tendered, the price of the May wheat contract and associated spreads began decreasing. Lansing's traders in the futures market began increasing its Long Wheat Spread and Wheat Call Option Positions at the now-depressed prices.

60.     Then, between March 5 and March 10, 2015, Lansing's traders purchased all 250 SRW of the 3 ppm Vomitoxin Wheat Certificates. Lansing did so at a 20-cent-per-bushel discount pursuant

to CBOT Rule 14104,[9] with the plan to cancel them for load-out soon thereafter. Lansing's goal by cancelling the 384 SRW Wheat Certificates for load-out was to signal artificial demand and increase the value of its conjunctively acquired Long Wheat Spread and Wheat Call Option Positions.

61.     Lansing traders communicated amongst each other and with other market participant co-conspirators on recorded telephone lines, demonstrating their understanding that the market did not expect the Wheat Certificates to be cancelled for load-out, and that Lansing doing so would lead other market participants to believe there was actually a market demand for 3 ppm vomitoxin wheat (when there really wasn't). The perception of increased market demand would result in an increased value of Lansing's own Long Wheat Spread and Wheat Call Option Positions.

62.     In a March 5, 2015 telephone call, for example, Lansing Trader 1 and another market participant co-conspirator discussed the effect cancelling and loading-out the Wheat Certificates would have on the price curve:

**March 5, 2015**:[10]

| | |
|---|---|
| Lansing Trader 1: | What do you think it does if someone can use it [the 3-vomitoxin wheat]? |
| Market Participant: | Say that again? |
| Lansing Trader 1: | What do you think it does to the curve [the price of the spread] if it gets cancelled? |
| Market Participant: | If somebody takes them? |
| Lansing Trader 1: | Yeah. |
| Market Participant: | Yeah, uh, boy, I think it has big ramifications. You've just traded everybody out of their position, and you've done it on the premise that you have a poisoned well. |

---

[9] CBOT Rule 14104 allows for the purchase of this higher-Vomitoxin wheat at a 20-cent-per-bushel discount.

[10] CFTC Order at 4-5.

63.    In another March 5, 2015 telephone call, Lansing Trader 1 discussed with Lansing Trader 2 what effect their plan would have on the price curve:

**March 5, 2015**:[11]

| | |
|---|---|
| Lansing Trader 1: | I think we just need to figure out what our endgame here is. I went and talked to [Lansing executive] and he was in support of it. Just, you know, what ultimately do we want to do here? What are your thoughts? |
| Lansing Trader 2: | I think we ultimately want to go through and execute this. |
| Lansing Trader 1: | How much do you think this shifts the curve? . . . Do you think this moves the curve seven cents if it was cancelled and executed? |
| Lansing Trader 2: | Yeah, I think you can see May-July get back to 2 to 3 cent carry July-Sept probably gets back to six cents, seven cents. |

64.    These March 5, 2015 communications (the same day Lansing began its purchasing of the 250 SRW Wheat Certificates) showcase Lansing's knowledge and intent that by purchasing the Wheat Certificates and then cancelling them for load-out, they would send false and misleading signals into the marketplace that would lead other market participants to believe there was demand for 3 ppm vomitoxin wheat, which would have the result of shifting the curve (pricing spread) of their own Long Wheat Spread and Wheat Call Option Positions. The market had no way to know at the time that those signals were false.

65.    On or before March 6, 2015, Lansing communicated with a co-conspirator writer of a daily cash wheat newsletter and multiple market participants to discuss sending signals into the market about Lansing's intent to cancel and load-out the Wheat Certificates. The newsletter writer agreed to Trader 1's request to disseminate information about Lansing's intent to cancel and load-out the Wheat Certificates. In a March 6, 2015 telephone call, Lansing Trader 1 told the co-conspirator newsletter

---

[11] CFTC Order at 5.

writer that the then-available receipts would not be available by night time, but added that: "I just wanted to make sure the market got lopsided first."[12]

66.    In a call later that day on March 6, 2015, Lansing Trader 1 memorialized the conversation he had with the co-conspirator newsletter writer with Lansing Trader 3:

**March 6, 2015**:[13]

| Lansing Trader 1: | Just a really good day man, and just this freaking market is just upside-down right now, and I've gotten so many calls about what in the f**k is going on in Chicago |
|---|---|
| Lansing Trader 3: | That's awesome. |
| Lansing Trader 1: | Ah man, yeah, it's just so lopsided, and I got [the newsletter writer], he's gonna give it the gas tonight, and it's gonna be good. He says, I'm just gonna give it the gas. |

67.    By having the newsletter writer disseminate the information that Lansing would cancel and load-out the Wheat Certificates, it signaled to the market that there was a demand for the Wheat Certificates, thus increasing the value of Lansing's Long Wheat Spread and Wheat Call Option Positions.

68.    By March 10, 2015, Lansing had cancelled all 384 SRW Wheat Certificates.

69.    As evidenced by internal and external communications between Lansing traders and John Doe Defendant co-conspirators, as well as Lansing's actual trading conduct, Lansing manipulated the prices of CBOT wheat futures and wheat options contracts by (1) receiving advance information that a market participant was registering and tendering for delivery a "large number" of shipping certificates with 3 ppm vomitoxin wheat, (2) purchasing the 250 SRW Wheat Certificates when they came available (adding to the 134 it already owned), (3) using a daily cash wheat newsletter writer and multiple other market participants as conduits to spread the information into the market

---

[12] CFTC Order at 5.

[13] CFTC Order at 5-6.

that it intended to cancel the 384 SRW Wheat Certificates for load-out, (4) cancelling for load-out the 384 SRW Wheat Certificates, and (5) all while gradually increasing its proprietary trading positions of its own Long Wheat Spread and Wheat Call Option Positions.

70.    Lansing's actions, as well as internal and external communications between Lansing traders and John Doe Defendant co-conspirators constituted overt acts to manipulate the price of the CBOT wheat futures and options contracts for their own benefit, thereby violating the CEA, 7 U.S.C. §§ 1, *et seq.*, the Sherman Antitrust Act, 15 U.S.C. § 1, and the common law.

## CLASS ACTION ALLEGATIONS

71.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and as a representative of the following Class:

> All persons or entities (other than Defendants and any parent, subsidiary, affiliate, or agent of any Defendants) that transacted in CBOT wheat futures or options contracts during the period February 1, 2015 through March 31, 2015 (the "Class Period").[14]

72.    The Class is so numerous that the individual joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least thousands of geographically dispersed Class members transacted in CBOT wheat futures and options contracts during the Class Period.

73.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

74.    Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is an adequate representative of the Class and has no interests which are adverse to the

---

[14] Plaintiff has defined the Class based on currently available information and hereby reserves the right to amend or expand the definition of the Class, including, without limitation, the Class Period and contracts at issue.

interests of absent Class members. Plaintiff has retained counsel competent and experienced in class action litigation, including commodity futures manipulation class action litigation.

75.    Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. These common questions of law and facts include, without limitation:

(a) Whether Defendants manipulated CBOT wheat futures and options contracts in violation of the CEA;

(b) Whether such manipulation by Defendants caused prices of CBOT wheat futures and options contracts to be artificial;

(c) Whether such manipulation by Defendants caused cognizable legal injury under the CEA;

(d) Whether Defendants' unlawful acts violate Section 1 of the Sherman Antitrust Act;

(e) The operative time period and extent of Defendants' foregoing violations; and

(f) Whether such injury or the fact or extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests.

(g) The appropriate measure of the amount of damages suffered by the Class.

76.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Treatment as a class action will permit a "large number" of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

77.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

78.     By its very nature, the unlawful activity alleged herein that Defendants engaged in was self-concealing.

79.     Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or any of the facts that could or would have led to the discovery thereof, until it became public on July 12, 2018, after the entry of the CFTC's Order.

80.     Because Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiff and the proposed Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure on July 12, 2018.

81.     Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled during the period of such fraudulent concealment.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(For Manipulation in Violation of the Commodity Exchange Act,
7 U.S.C. §§ 1, *et seq.* and Regulation 180.2))**

**Against All Defendants**

82.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

83.     Defendants, through their acts alleged herein, specifically intended to and did cause unlawful and artificial prices of CBOT wheat futures and options contracts during the Class Period.

84.    As alleged herein, Defendants had the ability to cause and did cause artificial prices. Defendants' trading and other activities alleged herein constitute market power manipulation of the prices of CBOT wheat futures and options contracts in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a).

85.    As alleged herein, Defendants manipulated the price of a commodity in interstate commerce or for future delivery on or subject to the rules of any registered entity, in violation of the CEA.

86.    Defendants' foregoing extensive manipulative conduct deprived Plaintiff and other traders of a lawfully operating market during the Class Period.

87.    Plaintiff and others who transacted in CBOT wheat futures and options contracts during the Class Period transacted at artificial and unlawful prices resulting from Defendants' manipulations in violation of the CEA, 7 U.S.C. §§ 1, *et seq.*, and as a direct result thereof were injured and suffered damages.

88.    Plaintiff and members of the Class are each entitled to actual damages sustained in CBOT wheat futures and options contracts for the violations of the CEA alleged herein.

## SECOND CLAIM FOR RELIEF

### (For Employing a Manipulative and Deceptive Device in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* and Regulation 180.1(a))

### Against All Defendants

89.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

90.    Defendants intended to affect or acted recklessly with regards to affecting prices of CBOT wheat futures and options contracts and engaged in overt acts in furtherance of their intent.

91.    As alleged herein, Defendants intentionally or recklessly used or employed a manipulative device or artifice to defraud and engaged in any act, practice or course of business which operated or would operate as a fraud or deceit upon any person, in violation of Section 6(c)(1) of the CEA (7 U.S.C. § 9), and Section 22 of the CEA (7 U.S.C. § 25), and Regulation 180.1(a), 17 C.F.R. § 180.1(a).

92.    Defendants' conduct proximately caused injury to Plaintiff and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices during the Class Period.

93.    Plaintiff and members of the Class are each entitled to actual damages sustained in CBOT wheat futures and options contracts for the violations of the CEA alleged herein.

### THIRD CLAIM FOR RELIEF

**(For Principal-Agent Liability in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* and Regulation 1.2)**

**Against All Defendants**

94.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

95.    Defendants were each an agent and/or other person on behalf of the other Defendants.

96.    This included when Defendants, through their employees, agents and/or others directed, developed, executed and otherwise acted with respect the scheme, artifice, or manipulative device alleged herein.

97.    Each Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B) and Regulation 1.2, 17C.F.R. § 1.2 (2014), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

98.     Plaintiff and members of the Class are each entitled to actual damages sustained in CBOT wheat futures and options contracts for the violations of the CEA alleged herein.

## FOURTH CLAIM FOR RELIEF

### (For Aiding and Abetting Manipulation in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*)

### Against All Defendants

99.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

100.     Defendants knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein. Defendants did so knowing their manipulation of CBOT wheat futures and options contracts prices, and willfully intended to assist these manipulations, which resulted in CBOT wheat futures and options contracts to reach artificial levels, during the Class Period in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

101.     Plaintiff and members of the Class are each entitled to actual damages sustained in CBOT wheat futures and options contracts for the violations of the CEA alleged herein.

## FIFTH CLAIM FOR RELIEF

### (Unjust Enrichment and Restitution/Disgorgement)

### Against All Defendants

102.     Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

103.     Defendants financially benefitted from their unlawful acts.

104.     These unlawful acts caused Plaintiff and other members of the Class to suffer injury, lose money, and transact in CBOT wheat futures and options contracts at artificial prices.

105.    In addition to being unlawful, Defendants' acts are also unfair and inequitable. It is thus unjust and inequitable for Defendants to have unjustly enriched themselves and now retain the benefits from manipulating CBOT wheat futures and options contracts.

106.    As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner.

107.    Each Defendant should pay its own unjust enrichment to Plaintiff and members of the Class.

108.    Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

### SIXTH CLAIM FOR RELIEF

**(For Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1)**

**Against All Defendants**

109.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

110.    Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*

111.    During the Class Period, Defendants entered into a series of agreements designed to create profit by manipulating the prices CBOT wheat futures and options contracts. Defendants simultaneously employed multiple manipulative tactics to this end, including (a) increasing their long May 2015/July 2015; July 2015/September 2015; and September 2015/December 2015 wheat spread positions ("Long Wheat Spread Positions"); (b) increasing their May 2015 and July 2015 wheat call option positions ("Wheat Call Option Positions"); (c) purchasing Wheat Certificates with the 3 ppm Vomitoxin wheat at a 20-cent-per-bushel discount pursuant to CBOT Rule 14104; (d) sending false

and misleading signals into the market for demand of the 3 ppm Vomitoxin by cancelling the Wheat Certificates for load-out and delivery in an attempt to influence the price of the wheat futures and options contracts being traded on the CBOT; and (e) increasing the value of Lansing's Long Wheat Spread and Wheat Call Option Positions;

112.     This conspiracy to manipulate CBOT wheat futures and options contracts restrained trade by fixing the prices of CBOT wheat futures and options contracts at artificial levels that did not accurately reflect market demand for prices of Wheat Certificates in the physical or cash wheat market, instead of the prices that would have been set by competitive market forces.

113.     Defendants' conduct caused injury to Plaintiff and members of the Class who transacted in CBOT wheat futures contracts and options at artificial prices than they would have otherwise paid in a competitive market.

114.     The conspiracy is a *per se* violation of § 1 of the Sherman Antitrust Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the CBOT wheat futures and options contract market. There is no legitimate business justification for, or pro-competitive benefits caused by, Defendants' conspiracy and overt acts taken in furtherance thereof. Any ostensible procompetitive benefits are pretextual or could have been achieved by less restrictive means.

115.     As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Antitrust Act, Plaintiff and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act, throughout the Class Period.

116.     Plaintiff and members of the Class are each entitled to seek treble damages sustained in CBOT wheat futures and options contracts for Defendants' violations of § 1 of the Sherman Antitrust Act under § 4 of the Clayton Act alleged herein.

## PRAYER FOR RELIEF

Accordingly, Plaintiff demands relief as follows:

A.      For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative, and its undersigned counsel be appointed as Class counsel;

B.      For a judgment awarding Plaintiff and the Class actual damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

C.      For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the Section 1 of the Sherman Antitrust Act, including treble damages, with prejudgment interest at the maximum rate allowable by law;

D.      For a judgment awarding Plaintiff and the Class any and all sums of Defendants' unjust enrichment;

E.      For an order impressing a constructive trust temporarily, preliminarily, permanently or otherwise on Defendants' unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiff and the Class;

F.      For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

G.      For such injunctive and declaratory relief, and such other and further relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury of all issues so triable.

July 20, 2018                                        Respectfully submitted,


                                                    s/      Anthony F. Fata
                                                    **CAFFERTY CLOBES MERIWETHER &**
                                                    **SPRENGEL LLP**
                                                    Anthony F. Fata
                                                    Jennifer W. Sprengel
                                                    Brian P. O'Connell
                                                    150 S. Wacker Drive, Suite 3000
                                                    Chicago, Illinois 60606
                                                    Tel.: 312-782-4880

                                                    **LOWEY DANNENBERG, P.C**
                                                    Vincent Briganti (*pro hac vice* forthcoming)
                                                    Geoffrey M. Horn (*pro hac vice* forthcoming)
                                                    Raymond Girnys (*pro hac vice* forthcoming)
                                                    Lee J. Lefkowitz (*pro hac vice* forthcoming)
                                                    44 South Broadway
                                                    White Plains, New York 10601
                                                    Tel.: 914-997-0500

                                                    *Counsel for Plaintiff and the Proposed Class*